AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
7/22/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: DTA DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California




UNITED STATES OF AMERICA,
Plaintiff,
v.

ALFONSO GOMEZ-SANTANA,
a/k/a "Alfonso Gomez,"
Defendant.

Case No. 8:22-mj-00508-DUTY

## CRIMINAL COMPLAINT
## BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, hereby state that the following is true to the best of my knowledge and belief. On or about the date of **June 22, 2022**, in the County of Orange, in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) | Possession with Intent to Distribute Fentanyl |

This criminal complaint is based on these facts:

*See* the facts set forth in the attached affidavit

☒ Continued on the attached sheet.

/S/
*Complainant's Signature*

Jessica E. Mendez, DEA Special Agent
*Printed Name and Title*

Attested to by the complainant via telephone in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: July 22,2022

*Judge's Signature*

City and State: Santa Ana, California

Hon. John D. Early, U.S. Magistrate Judge
*Printed Name and Title*

AUSA: Robert J. Keenan // Cell: (213) 393-7762

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Jessica E. Mendez, being duly sworn, declare and state as follows:

**INTRODUCTION**

1. I am an investigative and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516. I am currently a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), Los Angeles Field Division, Orange County District Office ("OCDO") and have been employed in this capacity since July 2017.

2. During the course of my employment, I have received comprehensive, formal instruction on such topics as drug identification; money laundering techniques; patterns of drug trafficking; complex conspiracies; the exploitation of narcotics traffickers' telecommunications devices; criminal law; surveillance; and other investigative techniques. I have initiated and assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics (including cocaine, heroin, and methamphetamine, the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including but not limited to such techniques as surveillance, confidential sources, search

warrants, telephone toll analysis, undercover operations, and wire intercept communications analysis in Title III and California State wiretap investigations.

**PURPOSE OF AFFIDAVIT**

3. This affidavit is made in support of a criminal complaint against, and arrest warrant for, **ALFONSO GOMEZ-SANTANA** ("GOMEZ") for a violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(vi) (Possession with Intent to Distribute Fentanyl).

4. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

5. The facts set forth in this affidavit are based upon: my review of law enforcement reports from the California Highway Patrol ("CHP") and Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force ("LA-IMPACT"), a lab report from the Orange County Crime Lab, certain photographs and undercover recordings, and pertinent database information; conversations with law enforcement personnel who were involved in the investigation summarized herein, including information that has been reported to me either directly or indirectly by such persons; debriefing of the Confidential Source referenced

herein; and, where noted, my personal observations and my training and experience.

**STATEMENT OF PROBABLE CAUSE**

**A. Commencement of Investigation**

6. Officers with LA-IMPACT learned from a Confidential Source ("CS") that the CS received a call from an unidentified male who indicated, in substance, that he was interested in selling fentanyl to the CS. That was followed by another call between the CS and another unidentified male. These initial calls were not recorded. However, I have talked with the CS about the calls, and have learned the following:

a. On June 21, 2022, the CS received a call from an Unidentified Male #1 ("UM1") utilizing a Mexico-based telephone number. On the same day, UM1 and the CS negotiated a drug deal in which the CS would buy 4 kilograms of fentanyl at $13,500 or $14,500 per kilo. (The CS did not recall the final agreed upon price, but the quantity was 4 kilos.) UM1 advised the CS that the CS would receive a call from an associate of UM1, calling on behalf of "Pris."

b. Later that day (June 21, 2022), the CS received a call from another Unidentified Male ("UM2") utilizing telephone number 424-368-1935 calling on behalf of "Pris." UM2 told the CS he was located in the Anaheim, CA area, near Lemon Street. The CS acknowledged and asked UM2 to send the CS an address. UM2 said okay and the call was terminated. Later that evening, at approximately 9:57 p.m., the CS texted UM2 and asked if he was

located near Disneyland. There was no response from UM2. I have reviewed this text for context and translation.

**B. June 22, 2022: Defendant GOMEZ Met with the CS to Conduct 4-Kilo Fentanyl Transaction**

7. On June 22, 2022, at approximately 10:15 a.m., the CS received a text message from UM2 with the following address: 1500 N. Lemon St., Anaheim, CA. I am informed that address is the location of a Lowe's Home Improvement Store. UM2 sent another text and asked the CS to let him know what time the CS would be stopping by. I have reviewed these texts for content and translation.

8. Continuing on the same day (June 22, 2022), at approximately 12:57 p.m., UM2 texted the CS and asked that the CS call him because they were going to head out. The CS contacted UM2 and let him know that the CS would not be available until later in the evening. UM2 said that was fine and would wait for the CS.

9. At approximately 4:06 p.m., on June 22, 2022, the CS texted UM2 and said he was on the way.

10. At approximately 5:00 p.m., the CS arrived at the 1500 N. Lemon Street address. Surveillance officers were present to monitor the CS and the expected transaction with UM2's associate (GOMEZ). At approximately 5:39 p.m., the CS texted UM2 and asked if his guy (GOMEZ) would be arriving soon. UM2 replied that he (GOMEZ) would arrive in 4 minutes. I have reviewed these texts for content and translation.

11. Around this time, the CS contacted UM2 by telephone. (This call was recorded, and I have listened to the recording. The conversation was conducted in Spanish. However, I am fluent in Spanish and am able to understand the conversation.) In the call, UM2 told the CS that his guy (later identified as defendant GOMEZ) would arrive in a convertible, two-door BMW. The CS spoke with UM2, who advised that he would call his guy (GOMEZ) as he (GOMEZ) was supposed to be ready. UM2 asked the CS if the CS had received a call from a 714 number, and the CS said no.

12. Shortly after this call, the CS observed a gray, 2-door BMW in the lot. Surveillance officers also observed GOMEZ’s vehicle around this time and observed the subsequent meeting between the CS and the driver, who officers later identified as GOMEZ.

13. Based on my debrief of the CS and conversations with LA-IMPACT officers Andrew Yanez and Rigo Barrios, I am informed that the CS exited the CS’s vehicle and signaled to GOMEZ. GOMEZ parked his vehicle in front of the CS’s vehicle, and the CS approached GOMEZ’s vehicle from the passenger side.

14. According to the CS, the CS greeted GOMEZ and said the CS had been waiting on GOMEZ. GOMEZ apologized and then pointed to a pillowcase, brown in color, located on the floorboard of the passenger side. GOMEZ proceeded to lift the pillowcase onto the passenger seat. The CS indicated that the CS could not see anything, and GOMEZ advised that it (referring to narcotics) was all inside the pillowcase. The CS then opened the pillowcase

and observed white grocery bags inside the pillowcase. The CS opened the bags and observed what was later identified as approximately 4 kilos of fentanyl.

15. The CS observed GOMEZ on the phone, and GOMEZ told the guy on the phone that he was there with the CS. The CS asked GOMEZ about the quality of the fentanyl and whether it burned at 4 or 4-50. GOMEZ said he did not know. The CS indicated generally that the money was at a park nearby and asked if GOMEZ wanted to follow the CS there or if he would prefer to wait until the CS returned. GOMEZ said he would follow the CS. At this time, the CS entered the CS's vehicle and departed the location.

16. The CS's meeting with GOMEZ was recorded by the CS's recording device. I have listened to the recording. The conversation was in Spanish, but, as noted above, I am fluent in Spanish and was able to understand those portions of the conversation that are audible in the recording. The recording did not pick up all of the CS's conversation with GOMEZ, including certain of GOMEZ's statements, but the recording is consistent with the CS's debrief of the meeting with GOMEZ.

17. After confirming that GOMEZ had the fentanyl with him, the CS signaled the surveillance team to advise them of that fact. The officers then asked a CHP patrol officer to conduct a traffic stop on GOMEZ's vehicle at or about the time the CS's vehicle left the shopping center parking lot and proceeded toward the referenced park.

**C. CHP Patrol Unit's Stop of Defendant GOMEZ's Vehicle**

18. At approximately 5:57 p.m. (1757 hours), CHP officer A. Bingham, using a marked CHP K-9 patrol unit, conducted a traffic stop on GOMEZ's vehicle for not having a license plate on the front of his car, in violation of Section 5200(a) of the California Vehicle Code. I have reviewed CHP Bingham's report of the stop of GOMEZ's vehicle and an LA-IMPACT report of the subsequent investigation, and I am informed of the following:

19. During the stop, Officer Bingham asked GOMEZ to step out of the car. In response to some questions, GOMEZ said he bought the car a week and a half ago at auction and everything in the car was his. When asked if he had anything illegal in the car, he said no, "everything is legal." Officer Bingham asked if he could search GOMEZ's car. GOMEZ consented to a search of his vehicle and signed a Spanish-language version of the CHP's consent-to-search form. Officer Bingham then deployed a drug-detection dog to do a sniff around the exterior of GOMEZ's car, and the dog alerted to the presence of narcotics on the passenger side of GOMEZ's vehicle.

20. After securing the dog back in his patrol vehicle, Officer Bingham conducted a search of GOMEZ's vehicle and found 4 kilos of fentanyl inside four separately-wrapped, "brick-sized" packages, which were concealed inside a small, decorative couch pillow, which was on the passenger seat, where the dog first detected the presence of drugs.

21. DEA has obtained from CHP a dash-cam video of Officer Bingham's stop of GOMEZ's vehicle. I have not reviewed the

video, but DEA Special Agent Patrick McMahon has reviewed it and advised me of the following additional details that he gleaned from the video: After finding the drug packages, Officer Bingham told GOMEZ that he had a lot of drugs in the pillow, noting that it's multiple "bricks." When the officer asked GOMEZ whether he knew of the drugs, GOMEZ denied knowledge. In response to a later question, GOMEZ added that "someone gave it to me." When asked if he had any more drugs in the car, GOMEZ said, "No, that's it."

**D. Interview of Defendant GOMEZ**

22. LA-IMPACT officers then arrived on scene and continued the investigation. LA-IMPACT Agent Andrew Yanez prepared a report of that aspect of the investigation. I have reviewed the report and learned the following:

a. The officers advised GOMEZ of his Miranda rights, and GOMEZ signed a written, Spanish-language form acknowledging his Miranda rights. (The form is attached to the LA-IMPACT report.) In response to questions, GOMEZ said that the drugs found in his vehicle were his, and he identified the drugs as fentanyl. GOMEZ said that he was supposed to deliver the fentanyl to someone, but he didn't want to give specific details as to whom he was going to deliver the drugs. GOMEZ said that he delivers narcotics for a source of income, noting that he earns $300 per kilogram that he transports and $200 per bundle of fentanyl pills that he delivers. GOMEZ also said that he had several other "kilos" of fentanyl and fentanyl pills at his residence.

b. GOMEZ consented to the police searching his residence and signed a consent-to-search form to that effect. (A copy of the signed form is attached to the LA-IMPACT report.) He also said the officers could use his key to enter the residence. That key was on the same key ring as the key to GOMEZ's car.

**E. Search of Defendant's Residence**

23. The CHP and LA-IMPACT reports provide further details regarding the consent search of GOMEZ's residence. Again, I have reviewed the reports and learned the following:

a. Pursuant to GOMEZ's consent, officers conducted a search of his residence at 415 ½ Commonwealth Avenue, Fullerton, CA 92832. During the search of the residence, officers found a locked bedroom. They used GOMEZ's key to gain entrance to the bedroom. The CHP's drug-detection dog inspected the bedroom and alerted to items in the closet. The officers then asked GOMEZ if he could tell them where to find the drugs. Upon being escorted into the residence, GOMEZ pointed to a blue duffel bag in the closet and said, "There's a lot of fentanyl pills in that bag." He then pointed to a white plastic bin, black canvas bag, and a cardboard box, and said, "There are more kilos of fentanyl and pills in there, too."

b. The officers then conducted a search of the closet and bedroom. Per the LA-IMPACT report, the officers found the following: In the white plastic bin, they found 9 kilograms of a white powdery substance resembling fentanyl. In the black canvas bag, they found 11 kilograms of a white powdery substance resembling fentanyl. (Two of the packages were later found to

contain white-powder heroin, as opposed to fentanyl.) In the cardboard box, they found 12 packages that each contained thousands of blue M-30 fentanyl pills. In the blue duffel bag, they found 13 packages that each contained thousands of blue M-30 fentanyl pills. Finally, the officers found a plastic baggie containing methamphetamine on a shelf in the bedroom.

**F. Lab Analysis**

24. The drug evidence seized from GOMEZ's car and residence were submitted to the Orange County Crime Lab ("OCCL"). On July 15, 2022, the OCCL issued a lab report, and I have reviewed the report. The OCCL's lab report notes gross weights for many of the seized drug exhibits, instead of net weights. Thus, the drug evidence was retrieved from the OCCL this morning and is being processed for delivery to the DEA lab on Monday morning to obtain net weights and for any further analysis that may be deemed necessary (e.g., determination of the purity of the methamphetamine).

25. According to the OCCL report, the four bricks of drug evidence seized from GOMEZ's car (OCCL Ex. #1) contain fentanyl. Each "brick" had a gross weight of slightly over 1 kilogram (1,000 grams), and, together, they have a total gross weight of 4.37 kilograms (or 4,367.39 grams). The lab report also notes that the other packages of white powder found at GOMEZ's residence (OCCL Exs. #2 and #3) contain fentanyl, except for two packages in OCCL Ex. #3 that were found to contain heroin. The lab report states that each of those "bricks" of fentanyl in OCCL Exs. #2 and #3 have gross weights of slightly over

1 kilogram, and the two bricks of heroin have net weights of approximately 1,006 and 1,007 grams. As to the packages containing blue pills (12 packages in OCCL Ex. #4, and 13 packages in OCCL Ex. #5), the lab report states that one pill was removed and tested from one of the packages in Ex. #4 and one removed and tested from one of the packages in Ex. #5, and both of those pills were found to contain fentanyl. As to the one package from OCCL Ex. #4 that was opened for analysis, the lab report states that the package had a net weight of 1,130.9 grams, and the remaining 11 unopened packages of blue pills together had a total gross weight of 11.57 KG. As to the one package from OCCL Ex. #5 that was opened for analysis, the lab report states that the package had a net weight of 1,047.6 grams, and the remaining 12 unopened packages of blue pills together had a total gross weight of 10.48 KG. Finally, as to the methamphetamine seized from GOMEZ's residence, the lab report states that the substance contains methamphetamine, with a total net weight of approximately 95.02 grams.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

**CONCLUSION**

26. Based on the foregoing, I believe probable cause exists to believe that ALFONSO GOMEZ-SANTANA has committed a violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(vi): Possession with Intent to Distribute Fentanyl.

/S/
Jessica E. Mendez,
Special Agent
Drug Enforcement Administration

Attested to by the applicant via telephone in accordance with the requirements of Fed. R. Crim. P. 4.1 on this day, July 22 , 2022.

HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE